UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| HOUSE OF GOD WHICH IS THE ) <br> CHURCH OF THE LIVING GOD THE ) <br> PILLAR AND GROUND OF THE TRUTH ) <br> WITHOUT CONTROVERSY, INC., ) <br> (KEITH DOMINION), ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> BISHOP CHARLES CAMPBELL, ) <br> CHARLES CAMPBELL, JR., and ) <br> PHILLIP CAMPBELL, ) <br> ) <br> Defendants. ) | No. 3:06-0066 <br> JUDGE ECHOLS |

## MEMORANDUM

This case is set for a bench trial on Tuesday, March 25, 2008. At the Final Pretrial Conference held on Monday, February 25, 2008, the Court raised *sua sponte* whether the Court has subject matter jurisdiction to hear this case concerning an internal church dispute. The Court asked counsel for the parties to file briefs on the issue. Plaintiff House of God Which Is The Church Of The Living God The Pillar And Ground Of The Truth Without Controversy, Inc. (Keith Dominion) filed a brief on March 3, 2008. (Docket Entry No. 71.) The Defendants, Bishop Charles Campbell and his sons, Charles T. Campbell and Phillip Campbell, filed a brief on March 10, 2008. (Docket Entry No. 76.) The Defendants also rely on the Declaration of Charles T. Campbell (Docket Entry No. 42) that was earlier submitted in opposition to Plaintiff's Motion for Summary Judgment.

1

The House of God asserts that the Court has subject matter jurisdiction and may continue to litigate this case without violating the First Amendment. Defendants suggest that the case should be dismissed for lack of subject matter jurisdiction.

## I. STANDARD OF REVIEW

Although the parties filed a Proposed Pretrial Order in which the parties agreed there were no jurisdictional issues, the parties can neither waive subject matter jurisdiction nor consent to subject matter jurisdiction where none exists. See Alongi v. Ford Motor Co., 386 F.3d 716, 728 (6th Cir. 2004). Any party to a dispute, including the Court acting *sua sponte*, may raise subject matter jurisdiction at any time in the course of litigation. In re Lewis, 398 F.3d 735, 739 (6th Cir. 2005). Where jurisdiction is put in issue, the Plaintiff, as the party invoking the Court's subject matter jurisdiction, has the burden to persuade the Court that jurisdiction exists in the case. American Fed'n of Gov't Employees v. Clinton, 180 F.3d 727, 729 (6th Cir. 1999).

## II. FACTS

The Complaint characterizes this case as an "action to collect payment from Defendants for monies that the Defendants caused the House of God to disburse for purported expenses relating to the House of God's Millennium and Centennial celebrations." (Docket Entry No. 1, Complaint ¶ 1.) The Complaint alleges that the House of God is a non-profit, religious organization organized under Tennessee law with its principal place of business in Nashville. (Id. ¶ 4.) The Chief Overseer-General Manager ("Chief Overseer") is the person who is the head of the House of God and all of its affiliate churches. (Id. ¶ 9.) Defendant Bishop Charles E. Campbell is a former Bishop, pastor, and Chief Helper to the Chief Overseer. He resides in the State of New York. (Id. ¶ 5.) Charles T.

2

Campbell and Phillip Campbell are the sons of Bishop Campbell and both also reside in the State of New York. (Id. ¶ 6.)

In summary, the Complaint alleges that the Chief Overseer, the late Bishop James Elliott, asked Bishop Campbell and his sons to plan the Millennium and Centennial celebrations held in Nashville, Tennessee, which is the headquarters of the House of God church. At Bishop Elliott's direction, the House of God provided $5,000 in church funds to Bishop Campbell for a Watch Night Service and Millennium Celebration in Nashville from 12/30/99 to 1/1/00. Several months later, Bishop Campbell requested $50,000 as an advance towards other expenses related to the Watch Night Service and Millennium Celebration. Subsequently, Bishop Campbell requested and received from Chief Overseer Elliott additional advances of $180,000 during 2002 (Id. ¶¶ 16, 17), to pay for expenses related to the Centennial Celebration, for a total disbursement of $235,000. (Id. ¶ 23.) In September 2003, the House of God began its Centennial Celebration in Nashville. The expenses were to be paid out of the funds paid in advance to Bishop Campbell. However, it is alleged Bishop Campbell did not pay for all the expenses and the House of God had to pay an additional amount of approximately $13,000 related to the event. (Id. ¶¶ 13-15.)

The Complaint alleges that Bishop Campbell and his sons failed to account for the funds and misappropriated certain of the church funds to their own use. Because of the alleged misappropriation, the House of God alleges it was required to pay vendors money to cover expenses that should have been paid through the funds provided to Bishop Campbell and his sons.

The Complaint further alleges that, when attempts to obtain an accounting of the funds from the Campbells failed, on or about June 11, 2004, "Bishop Campbell, Charles Campbell, and Phillip Campbell attended a meeting in Nashville, Tennessee before the Interim Chief Overseer [footnote

3

omitted], Deacon Thomas, and the Supreme Executive Council in order to answer charges that their failure to provide expense reports violated several decrees of the House of God." (Id. ¶ 23.) During this meeting, the Complaint alleges, the Campbells promised the Interim Chief Overseer and the Supreme Executive Council that they would submit within thirty (30) days documents to substantiate the disbursement of $235,000 for the celebrations. (Id. ¶ 23.) After several months, the House of God did not receive the expense report, and in a letter dated September 18, 2004, "the Interim Chief Overseer and the Supreme Executive Council notified Bishop Campbell that he was removed from all national committees of the House of God until this matter was resolved." (Id. ¶ 24.)

The Complaint alleges the House of God continued to try to obtain an accounting from Bishop Campbell. On December 2, 2004, Bishop Campbell appeared before the Chief Overseer, Deacon Thomas, and the Supreme Executive Council to present an expense report for the Centennial Celebration, but his report was deemed to be inadequate. (Id. ¶¶ 25-26.) On or about February 9, 2005, "pursuant to the decrees of the House of God," the Chief Overseer wrote a letter to the House of God's bishops, elders, pastors, ministers, deacons, and lay members articulating charges that were brought against Bishop Campbell. (Id. ¶ 27.) On or about June 24, 2005, the Chief Overseer and the Supreme Executive Council notified Bishop Campbell that

> he was removed as a State Bishop of the House of God; that he was removed as a general, state, and local trustee of any property paid for, in full or in part, by the House of God; that he was removed from every office held in any state of the House of God, including but not limited to Staff of Chief Helpers, Vice President and Board of Directors, Bishop of the State of New York, and Pastor of the House of God in Rush, New York; that he was silenced from any activities in the House of God; and that any previous appointments and licenses were revoked and annulled.

(Id. ¶ 28.) The Complaint further alleges that the Campbells never did provide the House of God with an expense report for the funds disbursed for the two celebrations. (Id. ¶ 29.)

The House of God brings seven causes of action: breach of contract against all Defendants (Count 1); breach of contract against Bishop Campbell (Count 2); conversion against all Defendants

4

(Count 3); unjust enrichment against all Defendants (Count 4); misrepresentation and fraud against all Defendants (Count 5); negligent misrepresentation against all Defendants (Count 6); and civil conspiracy against all Defendants (Count 7). The House of God requests that "the Court find that Defendants, individually or in concert, breached their contract by unlawfully using the disbursements that Plaintiff made to Defendants, converted the Plaintiff's property for personal use, and engaged in willful and/or negligent misrepresentation regarding the expense reports[.]" (Complaint, Prayer for Relief.) The House of God also seeks compensatory damages of at least $275,000, along with incidental damages, pre-judgment interest, costs and other equitable relief. (Id.)

Charles T. Campbell, in the Declaration he submitted earlier in the case, attested that he was a life-long member of the House of God. (Campbell Decl. ¶ 3.) He represents in his brief that he, his brother and his father "have since been excommunicated from the Church[,]" (Docket Entry No. 76, Reply Br. at 7), but the Campbell Declaration does not include that fact. In the Declaration, Charles Campbell set forth his view of the facts and denied that he, his brother and his father misappropriated church funds. He disputes that there was any written contract, and states "[w]e never received any correspondence from Bishop Elliott requesting that we provide an itemized expense report." (Campbell Decl. ¶ 5.) He further states that in June 2000, he, his father, and his brother met with Bishop Elliott, Deaconess Barbara Elliott and Kenneth Edmundson of the church to submit the report of the expenditures associated with the Millennium Celebration. The report consisted of "a folder with receipts for expenses as well as a spread sheet which listed general categories for which expenses were incurred. This was the format Bishop Elliott requested for submitting expenses." (Id. ¶ 7.) Campbell attested the "report was accepted as submitted and we did not retain a copy of the report." (Id.)

He further attested the Campbells did not have any other communications from the House of God about the Millennium Celebration expenses until June 2004, after the Chief Overseer, Bishop Elliott, died, and other church officials raised questions about expenses and use of funds for both celebrations. (Id. ¶¶ 7, 18-19.) Campbell further attested that an expense report was provided to a special committee of the House of God on June 11, 2004, and the expense report was done in the same format as that presented to Bishop Elliott in June 2000. Campbell claims that General Elder Tim Mims reviewed the report and agreed with the Campbells that the report and receipts accounted for $172,000 of the $180,000 budget for the Centennial celebration. (Id. ¶ 19.)

### III. ANALYSIS

In matters involving questions of church discipline, faith, or ecclesiastical rule, custom, or law, the Free Exercise Clause of the First Amendment requires that "no civil court interfere with the determinations of the 'highest of these church judicatories to which the matter has been carried.'" Ogle v. Church of God, 153 Fed.Appx. 371, 375 (6th Cir. 2005) (quoting Watson v. Jones, 13 Wall. 679, 727 (1871); Lewis v. Seventh Day Adventists Lake Region Conference, 978 F.2d 940, 941-942 (6th Cir. 1992)). Two doctrines operate to preclude a civil court from exercising jurisdiction over ecclesiastical matters– the ministerial exception doctrine and the ecclesiastical abstinence doctrine.

The ministerial exception doctrine comes into play in cases where church employment relationships with staff are at issue. The First Amendment's guarantee of religious freedom protects a religious institution's right to be free from judicial interference in the selection and discipline of its ministers. Hollins v. Methodist Healthcare, Inc., 474 F.3d 223, 225 (6th Cir. 2007). The exception has been extended to apply also to church employees whose primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship. Id. The ministerial exception does not precisely apply to bar jurisdiction over this case because neither the House of God nor the Campbells seek the

Court's adjudication to terminate or restore an employment relationship, even though it is pertinent that the House of God defrocked Bishop Campbell and apparently excommunicated him and his sons in the course of the dispute over use of church funds.

At issue in this case are the internal practices, affairs and management of the House of God, some or all of which may touch upon the church's religious doctrine. Civil courts have "an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively." Jones v. Wolf, 443 U.S. 595, 602 (1979). The First Amendment, however, severely circumscribes the role that a civil court may play in resolving a church property dispute. Id. "Most importantly, the First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice." Id.; Serbian Orthodox Diocese v. Milivojevich, 426 U.S. 696, 710 (1976). "As a corollary to this commandment, the [First] Amendment requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization." Jones, 443 U.S. at 602. A civil court may adjudicate a church property dispute "'so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or tenets of faith.'" Id. Thus, the purpose of the ecclesiastical abstention doctrine is to give religious organizations "an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North Am., 344 U.S. 94, 116 (1952) (discussing Watson v. Jones).

Although the House of God argues that it invokes the Court's subject matter jurisdiction to resolve claims against the Defendants that are purely secular in nature, the House of God's own pleading complicates its position. The Complaint alleges that, when attempts by the House of God to obtain an accounting of funds from the Campbells failed, in June 2004 the Defendants were

7

summoned to a meeting in Nashville before the Interim Chief Overseer, Deacon Thomas and the Supreme Executive Council "in order to answer charges that their failure to provide expense reports violated several decrees of the House of God." (Id. ¶ 23 emphasis added.) When the Defendants thereafter failed to fulfill their alleged promises to provide church officials with expense reports, on or about February 9, 2005, "pursuant to the decrees of the House of God," the Chief Overseer wrote a letter to the House of God's bishops, elders, pastors, ministers, deacons, and lay members articulating charges that were brought against Bishop Campbell. (Id. ¶ 27 emphasis added.) Although not entirely clear, it appears to the Court that these "decrees of the House of God" relate to the church's tenets of faith. When the Campbells failed to satisfy the requests of the Chief Overseer and the Supreme Executive Council, the Campbells were severely disciplined at the highest ecclesiastical level of the church. Such discipline, however, could not restore the allegedly converted funds to the church coffer, and to achieve this end, the House of God turned to this civil court for assistance in obtaining a civil remedy.

While it is tempting to assert jurisdiction and proceed with this case like all others raising similar state common law claims, the Court cannot ignore that adjudicating this dispute will very likely pull the Court into a quandary foreseen by the First Amendment. Can the Court decide whether Defendants' alleged conduct violated the civil law of the state without also deciding, even in part, whether the same conduct violated the "decrees of the House of God" or whether one presumed governing body of the church has overruled a decision by an earlier governing body, and if so, was such action authorized? The Court can conceive of no appropriate way to step into this fray without potentially rejecting "the decisions of the highest ecclesiastical tribunals of this hierarchical church upon the issues in dispute[.]" Serbian Orthodox Diocese, 426 U.S. at 708.

As examples of the types of factual issues that would come before the Court, Charles T. Campbell attests that there were no written contracts; that the Campbells acted as volunteers at the

8

behest of Bishop Elliott, Chief Overseer; that Bishop Elliott approved the expense report with receipts that the Campbells submitted concerning the Millennium celebration; that the Campbells did not keep a copy of the expense report Bishop Elliott approved; and that it was not until Bishop Elliott's death in 2004 that other church officials reopened the matter and raised concerns about the expenditure of funds. Obviously, Chief Overseer Elliott would have been a critical witness to the disputed events, but he is unavailable to testify. No doubt the House of God would present other sources of evidence, presumably testimony of other church officials, in an effort to explain what might have been in Bishop Elliott's mind at the time of these events and whether the dealings of the parties would have been governed by church rules, practice, custom, or doctrine, and if so, whether Bishop Campbell or others exceeded or violated such authority.

It seems apparent that the issues to be resolved are more complicated than a mere secular business dispute as alleged by the Plaintiff. For instance, did Bishop Elliott, as Chief Overseer, approve the expenditures and expense report submitted by the Campbells when he recruited them to plan and execute the religious celebration events? If so, was the successor Chief Overseer authorized to overrule the prior decision and reopen the matter? Other questions also arise, such as were there restrictions or boundaries established by Bishop Elliott or by church law, rules or doctrine that governed the purpose, type, and size of the celebration events, related activities, and the amount of permitted expenditures? If church doctrine, decrees, or laws are relevant, how should they apply to the facts of this case? What degree of discretion was placed upon Bishop Campbell? What were his bounds and where are they prescribed? Were personal expenses incurred by the Campbells, and if so, were they allowed to be reimbursed? In addition, it could be argued that Plaintiff's present money damage claims against the Campbells are a result of the church's own internal disciplinary actions and decision making.

In summary, in determining whether a contract was formed or breached, whether misrepresentations were made, whether money was converted, or whether a civil conspiracy was framed, the Court would place itself in substantial danger of becoming entangled in a religious controversy about the application of the "decrees of the House of God" central to the church's internal governance. Trial of the liability and damages issues would require the Court to make numerous credibility determinations and to find facts and draw conclusions based on those credibility determinations. This is a far different exercise than deferring to the resolution of issues of religious doctrine made by the highest court of a hierarchical church organization, as the First Amendment requires. See Jones, 443 U.S. at 602.

This is not a case in which the Court may engage in limited review of the decision of the House of God's Supreme Executive Council to discern whether its disciplinary decisions were fraudulent, collusive, or arbitrary, for the Campbells do not even ask the Court to resolve such issues as to the church discipline they received. See Serbian Eastern Orthodox Diocese, 426 U.S. at 712. Nor is this a case in which the Court might apply "neutral principles of law" to resolve a property dispute because, as explained, this litigation may well "turn on the resolution . . . of controversies over religious doctrine and practice." Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440, 449 (1969).

## IV. CONCLUSION

The Court concludes that Plaintiff House of God has not carried its burden to show that the Court has subject matter jurisdiction over this case. Therefore, for all of the reasons stated, the Court will dismiss the case without prejudice for lack of subject matter jurisdiction.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE